**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KHALIL HAMMOND, DAVID THOMPSON, ANTOINE WALKER, MUWSA GREEN, TYRONE LEONARD, and MALIKA HENDERSON, on their own behalf and on behalf of all others similarly situated, | : : : : : : : | CIVIL ACTION NO. _____  COMPLAINT – CLASS ACTION  JURY TRIAL DEMANDED |
| Plaintiffs, | : : | |
| v. | : : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS; LAUREL HARRY, Secretary of Corrections; GEORGE M. LITTLE, former Secretary of Corrections; MICHAEL WENEROWICZ, Executive Deputy Secretary for Institutional Operations, Pennsylvania Department of Corrections; LUCAS MALISHCHAK, Director of Psychology, Pennsylvania Department of Corrections; | : : : : : : : : : : : | |
| Defendants. | : | |

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.     This class action lawsuit seeks to end the unlawful use of solitary confinement in the Pennsylvania Department of Corrections (DOC).

2.     All DOC prisons have restrictive housing units that hold incarcerated individuals in long-term, often indefinite, solitary confinement. These solitary confinement units are all classified as Security Level 5 (SL5) units, and include but are not limited to the Intensive Management Unit (IMU) and the Restricted Housing Unit (RHU).

3.     There are many such solitary confinement units throughout the DOC. Periodically, certain units will close and new ones with new names are created.

1

4.      Solitary confinement, as used in this Complaint, describes imprisonment under conditions of severely restricted environmental, social, and occupational stimulation. Solitary confinement is defined less by the purpose for which it is imposed, or the exact amount of time during which prisoners are confined to their cells, than by the degree to which they are deprived of normal, direct, meaningful social contact and denied access to positive environmental stimulation, programming, and activity. Even a regime incorporating a few daily hours of "out-of-cell" time during which a prisoner is nonetheless still prohibited from engaging in normal meaningful social contact still constitutes a painful and damaging form of solitary confinement.

5.      Individuals incarcerated in solitary confinement in the DOC are locked in extremely small cells for as many as 21 to 24 hours every day and denied necessary social, environmental, and occupational stimulation.

6.      Many incarcerated in solitary confinement units have been in continuous, indefinite solitary confinement for upwards of 5, 10, and 15 years.

7.      Individuals with mental health diagnoses are disproportionately placed in solitary confinement; while individuals with mental illness are 37% of the DOC population, they are 50% of the DOC's solitary confinement population.

8.      Prolonged isolation under these extremely harsh conditions exacerbates the symptoms of these individuals' mental illness, including sleeplessness, hopelessness, hallucinations, paranoia, and results in individuals refusing to leave their cells, declining medical treatment, consuming foreign objects, overdosing on pills, covering themselves with feces, eating their own feces, head banging, cutting themselves, injuring themselves, and suicide attempts.

9.      Furthermore, these conditions generate the need for mental health treatment in individuals with no history of mental health treatment.

10.     While only about 5% of the DOC's population is in solitary confinement at any given time, approximately 40% of suicides and suicide attempts in the DOC occur on solitary confinement units.

11.     It is by now a scientific fact that solitary confinement creates and worsens a predictable constellation of adverse psychological symptoms including but not limited to uncontrollable anxiety, impaired impulse control, depression and suicidality, cognitive impairments, memory loss, and auditory and visual hallucinations.

12.     The result is a nightmare: many individuals held in solitary confinement units are trapped in a never-ending cycle of isolation and punishment resulting in further deterioration of their mental health, deprivation of adequate mental health care, lack of any prospect or avenues for release, and an inability to qualify for parole.

13.     Plaintiffs seek to end the prolonged, endless cycle of torture of incarcerated individuals in solitary confinement units in the DOC. Plaintiffs seek an injunction requiring that Defendants end the solitary confinement of themselves and Class Members and provide them with functional avenues for re-entry into the general prison population.

14.     Plaintiffs also seek damages from Defendants for the violation of their constitutional and statutory rights.

## JURISDICTION AND VENUE

15.     This case is brought pursuant to 42 U.S.C.§ 1983; 28 U.S.C. §§ 2201, 2202; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

16.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

17.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred at SCI Phoenix, which is in the Eastern District of Pennsylvania.

## PARTIES

18.     Plaintiff Khalil Hammond is currently housed in solitary confinement in the IMU at SCI Phoenix. He is on the Restricted Release List (RRL) and has been since 2013. Mr. Hammond has been in solitary confinement for twelve consecutive years. Prior to his incarceration, Mr. Hammond was diagnosed with Bipolar I Disorder, PTSD, and attention-deficit/hyperactivity disorder (ADHD). Mr. Hammond's time in solitary confinement has caused him additional mental health symptoms, distress, and suffering.

19.     Plaintiff David Thompson is incarcerated at SCI Pine Grove. Mr. Thompson has spent approximately five years of his six years in DOC custody in solitary confinement. Mr. Thompson has a history of mental health institutionalization since he was 12 years old. Prior to his incarceration, Mr. Thompson was diagnosed with anxiety and depression. Mr. Thompson's time in solitary confinement has worsened his anxiety and depression and caused him to become suicidal, with three suicide attempts during his time in solitary confinement.

20.     Plaintiff Antoine Walker is currently housed in solitary confinement in the IMU at SCI Greene. He is on the RRL and has been since 2018. Mr. Walker has been in solitary confinement for six years. He has been diagnosed with anxiety for which he has been prescribed medication while in DOC custody. During Mr. Walker's time in solitary confinement, his mental health has degraded, he has attempted suicide or engaged in self-harm at least ten times, and his physical health has also degraded, causing him to suffer deep vein thrombosis.

21.     Plaintiff Muwsa Green is currently housed in solitary confinement in the RHU at SCI Houtzdale. Mr. Green has spent more than ten years in solitary confinement during his time in DOC custody. Prior to his incarceration, Mr. Green received inpatient psychiatric care as a child and was diagnosed with schizophrenia and other mental health conditions. While in DOC custody, Mr. Green has been diagnosed with schizophrenia, borderline intellectual functioning disorder, and impulse control disorder, and has been prescribed psychotropic medication. His time in solitary confinement has worsened his mental health and caused him to become suicidal, resulting in many suicide attempts and acts of self-harm.

22.     Plaintiff Tyrone Leonard is incarcerated at SCI Rockview. Mr. Leonard has been incarcerated in the DOC since 2016 and has spent approximately five years in solitary confinement. Before his incarceration in the DOC, Mr. Leonard was diagnosed with bipolar disorder and antisocial personality disorder, and he has been prescribed psychotropic medication while in DOC custody. Mr. Leonard's time in solitary confinement has worsened his anxiety and caused him to attempt suicide three times while in solitary confinement.

23.     Plaintiff Malika Henderson is currently housed in solitary confinement in the RHU at SCI Muncy. She has been in solitary confinement for the past 21 months. During her time in DOC custody, she has cumulatively spent more than six years in solitary confinement. She is on the RRL. Ms. Henderson has been diagnosed with mood disorder, anxiety, and PTSD. Ms. Henderson's time in solitary confinement has caused her worsening anxiety, diminished self-esteem, and severe suicidality, resulting in more than 10 suicide attempts in less than two years.

24.     Defendant Laurel R. Harry is the Secretary of Corrections of the Commonwealth of Pennsylvania.  She became Acting Secretary of the DOC in January 2023 and was confirmed as Secretary by the Pennsylvania Senate in June 2023. In this capacity, Defendant Harry is

responsible for the management and operation of the entire adult corrections system in the Commonwealth and for protecting the constitutional and statutory rights of all individuals in the custody of the DOC, including those held in solitary confinement units. Additionally, Defendant Harry determines rules, regulations, and policy regarding management, personnel, and the overall operation of the DOC, including all solitary confinement units. Defendant Harry authorized or acquiesced in the unconstitutional policies of holding individuals in solitary confinement as described herein. Defendant Harry is sued in her individual and official capacities.

25.    Defendant George Little is the former Acting Secretary of Corrections of the Commonwealth of Pennsylvania.  He was Acting Secretary of the DOC from September 2021 until January 2023. In this capacity, Defendant Little was responsible for the management and operation of the entire adult corrections system in the Commonwealth and for protecting the constitutional and statutory rights of all individuals in the custody of the DOC, including those held in solitary confinement units. Additionally, Defendant Little determined rules, regulations, and policy regarding management, personnel, and the overall operation of the DOC, including all solitary confinement units.  Defendant Little authorized or acquiesced in the unconstitutional policies of housing incarcerated individuals in solitary confinement as described herein. Defendant Little is sued in his individual capacity.

26.    Defendant Michael Wenerowicz is the Executive Deputy Secretary for Institutional Operations (EDSI) of the DOC. Defendant Wenerowicz authorized or acquiesced in the unconstitutional policies of holding incarcerated individuals in solitary confinement as described herein and also has the authority to determine if and when individuals on the RRL are released from solitary confinement. Defendant Wenerowicz is sued in his individual and official capacities.

27.    Defendant Lucas Malishchak is the Director of Psychology for the DOC. In this capacity, Defendant Malishchak is responsible for overseeing treatment of mental health patients in DOC custody, including the provision of services and accommodations for mental health patients subject to the disciplinary system and the conditions of solitary confinement described in this Complaint. Defendant Malishchak is sued in his individual and official capacities.

## STATEMENT OF FACTS

### The Risks and Harms of Solitary Confinement

28.    Isolation causes painful, severe, and oftentimes irreversible harm. There is a substantial body of literature from over the last 200 years documenting the harms of isolation, even for short periods of time.

29.    There is broad consensus in the medical and psychiatric communities on the harms from isolation.[1]

30.    People in isolation "suffer from a similar range of symptoms irrespective of differences in the physical conditions in various prisons and in the treatment of isolated inmates."[2]

31.    Studies also show that some people will continue to suffer from the consequences of isolation after they are released, with some suffering from permanent harms.[3]

---

[1] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325, 338 (2006) ("By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of voluminous medical literature."); Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 Nw. U. L. Rev. 211, 219-20 (2020) ("The basic harmfulness of solitary confinement is now a largely settled scientific fact," and further noting that "many professional mental health, medical, legal, human rights and correctional organizations have promulgated strong position statements that urge or require significantly limiting the use of solitary confinement and even prohibiting it entirely for especially vulnerable groups of prisoners.").
[2] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441, 488 (2006).
[3] Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of*

32.     The most widely documented consequences of isolation are its psychological effects.

33.     As one prison staff psychiatrist stated in 2002, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane. . . . Most people in isolation will fall apart."[4]

34.     The psychological effects include anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality.[5]

35.     These effects begin to manifest within hours or days of isolation, worsening with time and causing permanent damage to individuals, especially those who linger in isolation for months or years.

36.     For some people, isolation "can be as clinically distressing as physical torture."[6]

37.     Numerous studies show that people in isolation are more likely to engage in self-harm, self-mutilation, and suicide than those in the general prison population.[7]

38.      The research also shows that people in isolation are at risk of physiological

---

Supermax and Solitary Confinement, 23 N.Y.U. REV. L. & SOC. CHANGE 477, 534-39 (1997); Grassian, supra n. 1, 332–33.

[4] Human Rights Watch, Ill-Equipped: U.S. Prisons and Offenders with Mental Illness, at 149 (2003), available at https://www.hrw.org/reports/2003/usa1003/usa1003.pdf.

[5] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 CRIME & DELINQ. 124, 130–131 (2003).

[6] Jeffrey Metzner & Jamie Fellner, Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, 38 J. AM. ACAD. PSYCHIATRY & L. 104, 104 (2010).

[7] Haney, supra n. 5, at 131–32. For example, one study concluded that people in isolation in New York City jails were approximately 6.9 times more likely to commit suicide and self-mutilation than those in the general jail population. Fatos Kaba, et. al., Solitary Confinement and Risk of Self-Harm Among Jail Inmates, 104(3) AM. J. OF PUB. HEALTH 442, 445 (2014). Another study found that in systems where the percentage of people in isolation is 2% to 8%, 50% of the suicides in those systems occurred in isolation. Stuart Grassian & Terry Kupers, The Colorado Study vs. the Reality of Supermax Confinement, at 11 (Mar. 6, 2012).

consequences such as severe headaches; heart palpitations and increased heart rate; chest, abdominal, neck, and back pain; problems with digestion, diarrhea, and weight loss; loss of appetite; and dizziness and fainting.[8]

39.    Because human brains are designed for social interaction, social isolation also results in neurological changes to the brain, quickly degrading brain function.[9] Scientific studies have revealed that:

> [S]ocial and environmental deprivation has negative repercussions for both brain structure and function, including reduced cortical volume, diminished neuronal connections in cortical areas and the hippocampus, decreased myelin production, and altered activity in the reward system and the amygdala. These cerebral alterations have been connected to detachment from the environment, hostility towards others, high levels of aggression, as well as an increased risk of susceptibility to several behavioral conditions that emulate psychiatric diseases and disorders in humans, including neurodegenerative disorders and schizophrenia. Importantly, morphological and functional changes in the brain may occur even after a short period of time and appear to continue after the reintroduction of the subject into the social environment.[10]

40.    Researchers have observed lower levels of brain function because of isolation, including a decline of electroencephalogram activities after only seven days in isolation.[11]

41.    Although all incarcerated people placed in isolation are at risk of harm, some people are more susceptible to serious health consequences because of their disabilities, age, health conditions, or other characteristics.

42.    People with psychiatric or intellectual disabilities are more sensitive and reactive to psychological stressors and emotional pain.

---

[8] Smith, *supra* n. 2, at 489–90.
[9] Grassian, *supra* n. 1, at 331.
[10] Federica Coppola, *The brain in solitude: an (other) eighth amendment challenge to solitary confinement*, Journal of Law and the Biosciences, 184-225, September 25, 2019.
[11] Grassian, *supra* n. 1, at 335–36.

43.     As a result, isolation may worsen and intensify pre-existing mental-health-related symptoms such as depression, paranoia, psychosis, and anxiety, and can cause severe impairment in isolated individuals' ability to function.[12]

44.     Several professional correctional and healthcare organizations recommend that isolation should be used only sparingly, if at all.

45.     The National Commission on Correctional Health Care (NCCHC) states that people with mental illness, juveniles, and pregnant women should never be in isolation.[13]

46.     The NCCHC has also declared that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health."[14]

47.     The NCCHC further elaborates that prolonged solitary confinement should be banned altogether as a means of punishment.[15]

48.     Often claimed by prison officials as a method to promote safety, isolation has a counter-effect and precipitates aggressive or violent behavior.[16]

49.     Isolation impairs an individual's ability to engage in prosocial behavior and raises the likelihood that they engage in behavior that violates prison rules.

---

[12] Human Rights Watch, *Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons* (May 12, 2015), available at https://www.hrw.org/report/2015/05/12/callous-and-cruel-use-force-against-inmates-mental-disabilities-us-jails-and.
[13] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)* (Apr. 2016), https://www.ncchc.org/position-statements/solitary-confinement-isolation-2016 (last visited March 3, 2024).
[14] *Id*.
[15] *Id.*
[16] Haney, *supra* n. 1, at 233.

50.    Consequently, incarcerated individuals are frequently penalized with extended periods of solitary confinement, which only worsens the underlying issues.

51.    Individuals who are released from prison after serving time in solitary confinement also suffer higher rates of post-prison adjustment issues than formerly incarcerated persons in general and are more likely to die in their first year of community reentry from acts of suicide, opioid abuse, and homicide.[17]

52.    Human rights organizations and authorities recognize the harms of isolation and advocate for severe limitations on its use. The 2011 report of the Special Rapporteur On Torture And Other Cruel, Inhuman Or Degrading Treatment Or Punishment, for example, determined that more than 15 days in isolation amounts to torture, or cruel, inhuman and degrading treatment, and should be subject to an absolute prohibition.[18] Due to such physical and psychological effects, the report states that prolonged solitary confinement is in direct violation of Article 7 (Prohibition of torture, cruel, inhuman or degrading treatment or punishment) of the International Covenant on Civil and Political Rights, which is a legally binding international treaty that the United States ratified in 1992.[19]

53.    In 2015, the U.N. General Assembly revised its Standard Minimum Rules for the Treatment of Prisoners (renamed the "Mandela Rules") to state that, "[s]olitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to

---

[17] Haney, *supra* n. 1, at 250.
[18] Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 76, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Mendez).
[19] *Id*. at 21.

independent review."[20] The Mandela Rules forbid indefinite or prolonged use of isolation (defined as anything more than 15 consecutive days) and restrict its use for people with mental or physical disabilities.[21] Notably, the Mandela Rules emphasize that solitary confinement should never be used as a form of punishment.

## Deliberate Indifference of Defendants

54.    Defendants are thoroughly aware of the serious risks and harms presented by solitary confinement, including the risks to individuals with psychiatric disabilities and the risks posed by prolonged, indefinite solitary confinement.

55.    The DOC recognizes that "[t]he potential for suicide is greater if the individual is subjected to pressures such as, but not limited to: . . . placement in RHU/SMU [and] any movement to and from Level 5 Housing Unit[.]"[22]

56.    Defendants have failed to take adequate steps to ensure that mentally ill Plaintiffs[23] who express suicidal thoughts, attempt suicide, or engage in self-harm are not placed in solitary confinement for any significant length of time despite their knowledge that solitary confinement dramatically increases the risk of self-harm and suicide.

57.    The risks associated with solitary confinement are institutional knowledge within the DOC, especially at the highest levels, in light of the relevant case law, scientific literature, and guidance from organizations like NCCHC.

---

[20] United Nations General Assembly, United Nations Standard Minimum Rules for the Treatment of Prisoners, A/RES/70/175, Dec. 17, 2015, at 14, https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf  (hereinafter "Mandela Rules").
[21] Id.
[22]  DOC  Policy  13.8.1,  Access  to  Mental  Health  Care,  §  2(L)(1)(d),  available  at https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/13.08.01%20Access%20to%20Mental%20Health%20Care.pdf.
[23] Unless otherwise specified, throughout this complaint, the term "Plaintiffs" refers collectively to the named Plaintiffs and members of the putative classes.

58.     The horrors of solitary confinement in the DOC have been criticized by the U.S. Department of Justice, which issued a findings letter in 2014 stating "[t]he manner in which [the DOC] subjects prisoners with [serious mental illness] to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care" and "results in serious harm."[24]

59.     The DOJ's letter was sent to the then-Secretary of the DOC as well as the superintendent of each DOC prison, including Defendants Harry and Wenerowicz, who were both superintendents at the time.

60.     The other Defendants are aware of the DOJ's findings letter as well.

61.     In 2016, a court found that the Secretary of the DOC at the time, John Wetzel, "knows well the risks inherent in prolonged isolation … [and has] stated he is familiar with the [scholarly literature] which sets forth at length the harmful effects of solitary confinement."[25]

62.     A few years later, in another case, Steven Glunt, a DOC deputy secretary and former superintendent who was serving as the DOC's designee in a lawsuit challenging the DOC's use of solitary confinement, acknowledged that "[i]f you put [people] in an environment where there's not an opportunity to be interactive, stimulate their thought processes, to grow . . . they start to decompensate. And then that increases their risk of self-harm."[26]

---

[24] U.S. Dep't of Justice, *Findings Letter: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities*, Feb. 24, 2014, at 2–3, https://www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc_finding_2-24-14.pdf.
[25] *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016).
[26] *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 445 (3d Cir. 2020).

63.     In 2017, the U.S Court of Appeals for the Third Circuit "acknowledge[d] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement."[27]

64.     The Third Circuit "observed a growing consensus—with roots going back a century—that [solitary confinement] conditions … can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity," as well as physical harm, including suicide and self-mutilation.[28]

65.     It would "defy logic" to suggest that any corrections professionals could be unaware of the potential harm that the lack of human interaction in solitary confinement can cause.[29]

66.     Despite the growing body of knowledge recognizing that solitary confinement presents extraordinary risks and harms, especially for those with psychiatric disabilities, Defendants authorized placing and maintaining Plaintiffs in solitary confinement housing units.

67.     Despite knowing that the DOC offers insufficient out-of-cell time and inadequate opportunities for social interaction and programming, Defendant Malishchak has failed to take reasonable or adequate measures to ensure that mental health patients in DOC custody are provided alternatives to solitary confinement that do not aggravate their mental health conditions.

68.     Defendants failed to enact and/or enforce policies requiring a mental health evaluation prior to solitary confinement placement.

---

[27] *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017).
[28] *Id.* at 225–26 (quoting *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566–68 (3d Cir. 2017)).
[29] *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019).

14

69.     Defendant Malishcak, who is responsible for ensuring access to mental health treatment throughout the DOC, has failed to enact policies and practices that ensure confidential evaluations prior to solitary confinement placement that will identify risk factors for decompensation.

70.     Defendants, including and especially Defendant Malishchak, failed to require mental health staff to perform assessments of those held in solitary confinement units tailored to identifying and treating adverse symptoms associated with isolation and failed to provide them necessary guidance, protocols, and training needed to perform such assessments.

71.     All Defendants, in particular Defendant Malishchak, have failed to enact commonsense, minimal standards for identifying isolation-related decompensation for those held in solitary confinement units.

72.     Such standards would include providing regular, confidential mental health evaluations and utilizing a standard set of questions designed to elicit meaningful and accurate psychological information pertaining to the impact of solitary confinement.

73.     In other words, Defendants have placed Plaintiffs in conditions of solitary confinement that are known to cause serious harm, and sanctioned a mental health system that consciously avoids inquiry into the specific harms associated with solitary confinement.

74.     As a consequence of Defendants' failure to ensure basic mental health screening and identify isolation-related decompensation, Plaintiffs have experienced perilous decompensation, including severely heightened anxiety, depression, inability to concentrate, intrusive thoughts, self-harm, suicidality and suicide attempts.

75.    Further, placement of individuals in long-term solitary confinement cannot be justified by its penological benefits as Defendants have never assessed whether its operation results in any benefits.

76.    There is no evidence that placement in solitary confinement does anything to reduce violence or otherwise foster safety inside prisons.

77.    Upon information and belief, neither the DOC nor individual Defendants have ever conducted an analysis, audit, study, or other assessment as to whether solitary confinement units result in increased safety and rule compliance compared to alternative sanctions.

78.    Justifications for the continued use of solitary confinement units lack any empirical support.

79.    In fact, there is ample evidence that facilities that reduce the use of solitary confinement experience improvements in prison safety.[30]

80.    Solitary confinement also threatens public safety more generally, since those who spend time in solitary are at heightened risk of recidivism upon release.

## Solitary Confinement Units and Classification in the DOC

81.    Solitary confinement describes imprisonment under conditions of severely restricted environmental, social, and occupational stimulation.

82.    Broadly speaking, solitary confinement, also referred to as restrictive housing, segregation, or isolation, is any type of detention that involves removal from the general prisoner

---

[30] Ryan M. Labrecque, *The Effect of Solitary Confinement on Institutional Misconduct: A Longitudinal Evaluation* (2015), available at https://www.ojp.gov/pdffiles1/nij/grants/249013.pdf; Ryan M. Labrecque, *The Use of Administrative Segregation and Its Function in the Institutional Setting*, in RESTRICTIVE HOUSING IN THE U.S.: ISSUES, CHALLENGES, AND FUTURE DIRECTIONS (2016), available at https://www.ojp.gov/pdffiles1/nij/250315.pdf; Justine A. Medrano, Turgut Ozkan, and Robert Morris, *Solitary Confinement Exposure and Capital Inmate Misconduct*, 42 AM. J. OF CRIM. JUSTICE 863.

population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; inability to leave the room or cell for the vast majority of the day; extremely limited or no opportunities for direct and normal social contact with other human beings; and extremely limited or no opportunities for purposeful out-of-cell activity.[31]

83.    Solitary confinement is defined less by the purpose for which it is imposed, or the exact amount of time during which prisoners are confined to their cells, than by the degree to which they are deprived of normal, direct, meaningful social contact and denied access to positive environmental stimulation and activity.

84.    The DOC has a variety of solitary confinement units, with different names and purported purposes, which it collectively refers to as Security Level 5 or SL5 housing units.

85.    Individuals in SL5 units in the DOC are, as a general practice, kept inside their cells for 21 to 24 hours every day.

86.    While the various solitary confinement units purport to have different structures and programs, they share a common throughline: deprivation of regular and necessary social, environmental, and occupational stimulation.

87.    When Plaintiffs are permitted outside of their cells, they are typically placed in other enclosed spaces by themselves such as a shower cubicle or cage to exercise in, or at times handcuffed to tables.

---

[31] *See, e.g.*, U.S. Dep't of Justice, Report and Recommendations Concerning the Use of Restrictive Housing 3 (Jan. 2016); Craig Haney, Brie Williams, Jules Lobel, Cyrus Ahalt, Everett Allen & Leann Bertsch, *Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health*, 115 NW U. L. REV. 335, 337 (2020).

88.     Plaintiffs are subject to severe restrictions on their ability to communicate within the prison and with those outside the prison.

89.     Plaintiffs are extremely limited in the property they can keep in their cell.

90.     Plaintiffs are not able to participate in confidential communications with mental health staff.

*Restricted Housing Unit (RHU)*

91.     According to the January 2024 DOC Monthly Population report, there are more than 1,900 people held in restricted housing throughout the DOC.[32]

92.     Most of those in restricted housing are held in Restricted Housing Units (RHUs), which are located in every prison in the DOC.

93.     Individuals held in the RHU are classified as being on either Disciplinary Custody (DC) or Administrative Custody (AC) status.

94.     Those held on DC status are sentenced to RHU confinement for a determinate period as punishment for a disciplinary infraction within the DOC.

95.     Those held on AC status are held in the RHU for an indeterminate period for a broad range of reasons that are identified in the DOC's Administrative Custody policy.

96.     The vast majority of time in the RHU is spent alone in a cell.

97.     Per DOC policies in effect until January 22, 2024, the only out-of-cell time offered to individuals on AC or DC housed in RHUs was one hour alone in an outdoor recreation cage five days a week and three showers per week.

---

[32] Available at
https://www.cor.pa.gov/About%20Us/Statistics/Documents/Monthly%20Population%20Reports/Mtpop2401.pdf.

98.     The DOC enacted revised DC and AC policies, which took effect on January 22, 2024, that require additional out-of-cell time for individuals who have been in RHUs for longer than 30 days.

99.     According to these revised policies, after an individual has been on AC or DC continuously for more than 30 days, they must be offered three hours of daily out-of-cell time, seven days a week.

100.     Aside from a requirement that one of these daily hours be "exercise," which means placement alone in a recreation cage, the revised policies give each DOC prison, through its superintendent, complete discretion over the nature of the out-of-cell time that is offered.

101.     The revised policies do not require that the out-of-cell time involve social interaction or programming of any kind.

102.     The revised policies permit prisons to simply offer individuals in RHUs additional time alone in a recreation cage for the entirety of the mandated daily three hours.

103.     The revised policies therefore do nothing to ameliorate the isolation and lack of social, environmental, and occupational stimulation that are the essence of solitary confinement.

*Restricted Release List (RRL)*

104.     The Restricted Release List (RRL) is a list of individuals who are subject to indefinite solitary confinement in the DOC.

105.     DOC policy states that individuals may be placed on the RRL for reasons including but not limited to assaultive behavior or escape attempts.

106.     Individuals are not provided with the reason for their placement on RRL.

107.     Only the DOC's Executive Deputy Secretary for Institutional Operations, Defendant Wenerowicz, can authorize the placement and removal of an individual from the RRL.

108.    Once an individual is placed on the RRL, they are trapped in solitary confinement indefinitely.

109.    Placement and continuation on the RRL are not appealable.

110.    Those individuals being held in solitary confinement on the RRL are supposed to be provided an annual review of their RRL status.

111.    The annual review process involves the circulation of a "vote sheet" among selected DOC staff members to provide input on whether the RRL prisoner should remain on or be removed from the RRL.

112.    A psychological evaluation from within the previous six months is to be included in the annual review.

113.    The standards and considerations used by the DOC in conducting these annual reviews, if there are any, are unknown to those on the RRL.

114.    None of the information, opinions, evaluations, or recommendations included in the annual review are provided to the individual on the RRL who is being reviewed.

115.    Individuals on the RRL are not permitted to participate in the annual review process.

116.    The EDSI, Defendant Wenerowicz, has the final authority to remove someone from or continue them on the RRL, and he is not required to follow any recommendations from the annual reviews.

117.    Only the Secretary of Corrections, Defendant Harry, can overrule Defendant Wenerowicz's RRL decisions.

118. Individuals on the RRL are never provided the decision by the Defendant Wenerowicz as to why they will remain on the RRL, and they are not provided any rationale for these decisions.

119. Individuals on the RRL are not provided with a timeline or any specific criteria that will result in their removal from solitary confinement.

120. Individuals on the RRL are not informed of what they need to do in order to be released from the RRL and re-enter general population.

121. There are no known or identifiable criteria individuals can fulfill in order to be removed from the RRL.

122. On top of the typical harms of solitary confinement, individuals on the RRL face the additional psychological harms associated with the indeterminate duration of their solitary confinement.

123. Many individuals on the RRL fear they will spend the rest of their time in prison in solitary confinement, which, for those who have life-without-parole sentences, means the rest of their lives.

124. This uncertainty and fear of indefinite or permanent solitary confinement increases depression and suicidality.

125. There is no maximum length of time that a person may be held in solitary confinement on the RRL.

126. There are no restrictions in DOC policy against placing somebody with serious mental health conditions in indefinite solitary confinement on the RRL.

127. Individuals who are on the RRL are often, though not necessarily, placed in the IMU.

128.    Upon information and belief, there are approximately 125–200 people on the RRL.

_Intensive Management Unit (IMU)_

129.    The Intensive Management Unit (IMU) is one type of solitary confinement unit where Plaintiffs are confined.

130.    IMUs exist at SCI Greene, SCI Camp Hill, and SCI Phoenix.

131.    All, or nearly all, individuals housed in the IMU are on the RRL; most, though not all, individuals on the RRL are housed in the IMU.

132.    The IMU is a phased solitary confinement "program" that lasts at least 3 years, though the ultimate time spent in the program can be extended indefinitely.

133.    The IMU uses a six-tiered system of phases, starting with Phase 6 and ending with Phase 1, with slightly increased privileges granted at each phase.

134.    Regardless of phase, the vast majority of time is spent alone in a cell.

135.    As with other solitary confinement units, the only exercise time available to individuals in the IMU is in an outdoor recreation cage.

136.    Each phase has a minimum length but no maximum length.

137.    Phase 6 lasts a minimum of 30 days, Phases 5 through 3 a minimum of 9 months each, Phase 2 a minimum of eight months, and Phase 1 a minimum of one year.

138.    Phase 1 is a probationary period during which incarcerated individuals are either housed in a regular general population unit or a Management Control Unit, which is a unit in which individuals receive many general population privileges but are entirely segregated from the general prison population.

139.    Thus, the fastest that anyone can complete the IMU program is four years, and the fastest anyone can make it to general population is three years.

140.    On Phases 6 through 4, offered out-of-cell time is limited to two hours per day.

141.    On Phase 3, offered out-of-cell time increases to three hours per day.

142.    This amount of out-of-cell time is what is stated in DOC policy, but what is actually offered is often much less.

143.    The soonest an individual in the IMU can be permitted to leave their cell without restraints is after 60 days on Phase 3.

144.    Prior to that, for a period of at least 21 months, all out-of-cell time in the dayroom, to the extent it is even offered, involves restraints.

145.    When individuals on the IMU are only permitted two hours of out-of-cell time, that time consists of being placed in an outdoor cage.

146.    When an additional hour is added, individuals are either restrained to a table or allowed to be on the pod with a very small number of people, but they remain deprived of meaningful social and programmatic activities.

147.    When groups are offered, which is rare, individuals are handcuffed to a table.

148.    Starting on Phase 2, an individual in the IMU can be given a job as a block worker, cleaning the housing unit.

149.    There is nothing that a person held in the IMU can do to progress through the phases faster, but they can be set back a phase for various, unspecified reasons.

150.    There are no clear criteria for phase advancement either.

151.    Regardless of phase, individuals in the IMU are not permitted to have in-person visits, even non-contact visits, with friends or family; they are only permitted visits with their attorneys or other official visitors, and they are separated by a glass barrier.

152.    Progression to Phase 1 of the IMU requires the approval of the EDSI, currently Defendant Wenerowicz.

153.    Individuals who do not make progress in any phase are considered for placement on the RRL (if they are not already on it), labeled an "IMU failure," and transferred to an RHU.

154.    Most individuals in the IMU have been placed there directly from other solitary confinement units and have thus experienced long periods of continuous solitary confinement, for many of them lasting upwards of 10 years or more.

155.    To the extent the IMU is intended as a "stepdown program" aimed at transitioning individuals in prolonged solitary confinement back to general population (and it is not apparent that it is), it far exceeds the typical length of such programs nationwide, which generally range in length from about 1 month to a little over a year, with a median of about 90 days.

156.    The IMU also lacks the hallmarks of effective stepdown programs, including conditions that differ significantly from other restrictive housing units, meaningful out-of-cell group programming and activities, transparent and frequent reviews with clear and tangible criteria for advancement, and a goal of moving participants to general population in the shortest possible time.

157.    Upon information and belief, there are approximately 125–200 individuals housed on IMUs.

_Mental Health Classification_

158.    The DOC assigns every incarcerated person a letter designation from A to D on its Mental Health / Intellectual Disability Roster (MH/ID Roster).

159.    A-Roster individuals have no identified psychiatric or intellectual disability needs and no history of psychiatric treatment.

160.    B-Roster individuals have a history of psychiatric treatment but no current need for psychiatric treatment and no current need for follow-up or support from psychology staff.

161.    C-Roster individuals are currently receiving psychological treatment and may be receiving psychiatric treatment, including psychotropic medications, but are not currently diagnosed with a "serious mental illness" (SMI) as defined by the DOC.

162.    D-Roster individuals are currently diagnosed with an SMI, intellectual disability, or "credible functional impairment," or were found "guilty but mentally ill" in their criminal cases.

163.    Per DOC policy, D-Roster individuals on AC or DC must be provided at least 20 hours of out-of-cell time per week, a recognition by the DOC that the ordinary conditions of its SL5 units are not appropriate for individuals with SMI because of the substantial risk of harm such conditions pose for them.

164.    These conditions also pose a substantial risk of harm to people with mental health conditions not considered SMIs by the DOC, including PTSD, antisocial personality disorder, and suicidality, but the DOC nonetheless subjects C-Roster individuals—people with known needs for psychological treatment—to solitary confinement, with no modifications to ameliorate its negative effects.

165.    The DOC and its contracted providers determine what diagnoses an individual has and frequently change individuals' diagnoses from conditions considered to be SMIs to conditions not considered SMIs, causing their roster statuses to be changed from D to C.

166.    This enables the DOC to subject these individuals to its most restrictive forms of solitary confinement while also providing them fewer psychological services.

167.    These changes frequently occur without proper evaluation or explanation.

168.     Individuals with mental illness are more likely to be placed in solitary confinement in the DOC than individuals without mental illness: Close to 50% of those in SL5 units in the DOC are on the C or D Roster, while only about 37% of the total DOC population is on the C or D Roster.

169.     About 40% of individuals in SL5 units in the DOC are on the C Roster, while only about 29% of the DOC population as a whole is on the C Roster.

### Conditions in Solitary Confinement

170.     Incarcerated individuals who are held in solitary confinement units are subject to intolerable and inhumane conditions.

171.     Solitary confinement cells in the DOC generally only have a steel/concrete bed with a thin mattress and no pillow, a combination sink-toilet, and a small desk and chair.

172.     Many cells in solitary confinement units do not have a window facing outside and, therefore, incarcerated individuals held there are deprived of natural light and fresh air.

173.     The cell doors are solid steel—not bars—in the vast majority of DOC solitary confinement units, compounding individuals' physical isolation from others.

174.     The cell doors have a small slot through which food is passed.

175.     Each cell has a small window in the cell door that limits the individuals held within to only a very constricted view of the cell block.

176.     Solitary confinement units are extremely loud due to the slamming of solid steel cell doors and the screaming from incarcerated individuals suffering mental health crises.

177.     To speak to someone in a nearby cell, incarcerated individuals must yell through their food slot or the cracks between their cell doors and frames.

178.     Some individuals attempt to communicate with each other quietly by throwing paper poles tied to strings under their cell doors in a process known as "fishing."

179.    Such fishing is deemed a disciplinary violation and can result in increased time in solitary confinement.

180.    During the approximately 21 to 24 hours per day that individuals are forced to remain in their cells, the fluorescent lights in the cell are always on, making sleep difficult and disorienting their sense of time.

181.    Most of the incarcerated individuals in solitary confinement units must eat every meal by themselves in their cells. Only those on Phases 2, 3, and 4 of the IMU are allowed to eat some of their meals out of their cells.

182.    Despite unceasing isolation and confinement, prison guards strip-search incarcerated individuals on solitary confinement units before allowing them to step out of their cells for any reason.

183.    Individuals incarcerated on solitary confinement units are then handcuffed upon leaving their cells, and sometimes their legs are shackled.

*Restrictions on Visits*

184.    According to the Security Level 5 Housing Unit Policy, individuals incarcerated on solitary confinement units are allowed a small number of visits per month, the number and type of which varies depending on the incarcerated individual's particular status and housing unit.

185.    Individuals incarcerated on solitary confinement units are not allowed contact visitation, depriving them of physical contact with loved ones, a basic human need.

186.    In-person visitation for individuals on solitary confinement units occurs in a small room divided by a wall with a glass partition. The incarcerated person remains handcuffed here as well without any penological justification, but as an act of dehumanizing control.

187.    These visits are restricted to weekdays.

188.    Video visits, when they are permitted at all, are only 45 minutes.

189.    Aside from legal visits, individuals in the IMU are not permitted in-person visitation. Instead, family, friends, or others can only schedule 45-minute video visits, thus reinforcing their isolation from loved ones and community members.

190.    During video visits, the incarcerated individuals must speak through a phone, which can be difficult to hold because guards often keep them handcuffed throughout the virtual visit despite the fact that they are locked in a cage by themselves.

191.    Many who are held in solitary confinement units do not receive any visits because their family and loved ones cannot visit—even virtually—during the limited hours available due to work and family obligations.

*Lack of Programming*

192.    People in solitary confinement have no access to the vocational, rehabilitative, or therapeutic programs available to individuals in general population.

193.    People in solitary confinement have no access to gyms, weights, or other athletic equipment, which are all available to people in general population.

194.    There is generally no equipment or objects of any kind in the recreation cages on solitary confinement units, except SCI Phoenix has a medicine ball in some recreation cages in the IMU.

195.    Some of those incarcerated in solitary confinement units manifest symptoms of acute psychological decompensation while in the exercise cages. These symptoms may involve screaming, threatening others, and throwing feces. This type of behavior disincentivizes other individuals incarcerated in solitary from using the cages.

196.    Many in solitary confinement units do not utilize the outdoor cage because of their mental health symptoms, including fear of staff and other incarcerated people, heightened anxiety and traumatic stress symptoms, and severe depression.

197.    Individuals incarcerated in solitary confinement units have only limited access to telephones, reading material, radios, televisions, and commissary food.

*Lack of Mental Health Care*

198.    The DOC's policies recognize that individuals may suffer mental health emergencies while housed in solitary confinement.

199.    Individuals incarcerated in solitary confinement units receive grossly inadequate mental health treatment or none at all.

200.    Contacts with mental health staff occur, at best, infrequently.

201.    Typically, mental health staff members stand outside the cell and speak to incarcerated individuals through the food slot or the crack between the side of the cell door and frame.

202.    Such visits are not private and often last no more than a few seconds.

203.    These visits do not constitute meaningful mental health treatment.

204.    Because of the total lack of privacy, many incarcerated individuals refuse to speak to mental health staff during these visits, which are known as "drive-bys."

205.    In addition, many individuals on solitary confinement units suffering from mental illness require psychosocial rehabilitation services as part of their treatment.

206.    Psychosocial rehabilitation services include structured out-of-cell activities designed to decrease isolation, increase social interaction, increase treatment and medication compliance, and decrease psychiatric symptoms.

207.    Psychosocial rehabilitation services are not available in solitary confinement units.

*Comparison to General Population Units*

208.    The vast majority of those in DOC custody are in the general population, with less than 2,000 in SL5 units out of a total population in excess of 37,000.

209.    In general population units, people are permitted out of their cells most of the day.

210.    When in the day room on a housing unit in general population, the entire unit may be out of their cells at the same time, offering far greater opportunities for social interaction.

211.    People are permitted to walk about without restraints in the day room—or anywhere else—while in general population.

212.    Individuals do not have to undergo strip searches every time they leave their cells while in general population.

213.    Telephone and kiosk access are typically allowed multiple times per day in general population.

214.    Congregate religious services are offered in the general population, whereas they are not in solitary confinement.

215.    Group therapy is available in the general population. When group therapy is offered for those in the general population, the participants are not held in cages or otherwise restrained.

216.    Those in the general population have access to multiple programmatic opportunities that are not available to those in solitary confinement, including programs that are often prerequisites to being granted parole, such as violence prevention, cognitive-behavioral therapy, and drug and alcohol treatment.

217.    In general population, contact visitation is permitted and those receiving visits can embrace friends and loved ones. In solitary confinement, by contrast, contact visitation is

prohibited and human touch with anybody except guards placing handcuffs or otherwise restraining somebody is forbidden.

*Increased Risk of Self-Harm and Suicide in DOC Solitary Confinement Units*

218.    Despite approximately 5% of the DOC population being held in solitary confinement at any given time, the rates of self-harm incidents, suicide attempts, and suicides are dramatically higher in those units than in general population units.

219.    The DOC's data on self-harm incidents and suicide attempts almost certainly represent an undercount, as sometimes these incidents go unreported and/or undocumented.

220.    Indeed, some incarcerated individuals choose not to report incidents of self-harm or suicide attempts out of fear they will be met with a punitive response.

221.    The following chart includes the DOC's own data on self-injurious behaviors, which has been certified as correct by Defendant Malishchak, on behalf of the DOC:

**Number of Self-Injurious Behaviors in DOC: SL5 v. General Population**

| Year | SL5 Housing Units (approx. **5%** of DOC pop.) | General Population (approx. **95%** of DOC pop.) |
|------|------------------------------------------------|--------------------------------------------------|
| 2012 | 101 | 47 |
| 2013 | 176 | 180 |
| 2014 | 319 | 228 |
| 2015 | 487 | 503 |
| 2016 | 490 | 560 |
| 2017 | 521 | 572 |
| 2018 | 78 | 80 |
| 2019 | 26 | 38 |

222.    Notably, incidents of self-injurious behaviors increased every year from 2012 through 2017.

223.    Despite, or perhaps because of, these increases, according to a sworn interrogatory response from Defendant Malishchak on behalf of the DOC, the DOC simply stopped tracking incidents of self-injurious behavior that were not deemed suicide attempts in 2018.

224.    From 2012 through 2019, approximately 50% of incidents of self-injurious behavior in the DOC occurred on SL5 units despite those units housing only approximately 5% of the DOC population.

225.    The following chart includes the DOC's own data on suicide attempts, which has been certified as correct by Defendant Malishchak, on behalf of the DOC:

**Number of Suicide Attempts in DOC: SL5 v. General Population**

| Year | SL5 Housing Units (approx. **5%** of DOC pop.) | General Population (approx. **95%** of DOC pop.) |
|------|------|------|
| 2012 | 13 | 22 |
| 2013 | 8 | 21 |
| 2014 | 21 | 42 |
| 2015 | 34 | 52 |
| 2016 | 44 | 71 |
| 2017 | 57 | 126 |
| 2018 | 78 | 131 |
| 2019 | 69 | 139 |
| 2020 | 160 | 253 |
| 2021 | 138 | 188 |
| 2022 | 88 | 176 |

226.    From 2012 through 2022, approximately 37% of suicide attempts in the DOC occurred on SL5 units despite those units housing only approximately 5% of the DOC population.

227.    The following chart includes the DOC's own data on suicides, which has been certified as correct by Defendant Malishchak, on behalf of the DOC:

**Number of Suicides in DOC: SL5 v. General Population**

| Year | SL5 Housing Units (approx. **5%** of DOC pop.) | General Population (approx. **95%** of DOC pop.) |
|------|-----------------------------------------------|--------------------------------------------------|
| 2012 | 4 | 4 |
| 2013 | 4 | 4 |
| 2014 | 4 | 6 |
| 2015 | 3 | 5 |
| 2016 | 3 | 7 |
| 2017 | 6 | 8 |
| 2018 | 4 | 11 |
| 2019 | 7 | 12 |
| 2020 | 9 | 2 |
| 2021 | 7 | 5 |
| 2022 | 2 | 6 |

228.    From 2012 through 2022, approximately 43% of suicides in the DOC occurred on SL5 units despite those units housing only approximately 5% of the DOC population.

229.    The DOC and Defendant Malishchak are aware of the vastly disproportionate rates of self-injury, suicide attempts, and suicides in solitary confinement units.

230.    Defendants Harry and Little are either aware of the vastly disproportionate rates of self-injury, suicide attempts, and suicides in solitary confinement units or have opted, with deliberate indifference, not to review the data, which is readily available to them.

231.    Defendants have nonetheless continued to house people on SL5 units, including individuals with mental illness, and have failed to take reasonable or adequate measures to ameliorate the conditions that lead to self-injurious behaviors, suicide attempts, and suicides.

### Class Representatives

232.    All class representatives in this action have psychiatric disabilities that limit major life activities, including but not limited to cognitive function, concentrating, learning, thinking, communicating, and interacting with others.

*Khalil Hammond*

233.    Khalil Hammond is thirty-five years old, and he has been incarcerated in the DOC for nearly 13 years.

234.    Prior to his incarceration, Mr. Hammond was diagnosed with depression, bipolar disorder, ADHD, and PTSD.

235.     The DOC assigned Mr. Hammond a "C" designation on the MH/ID Roster, and he is receiving medication for his mental illness.

236.    Prior to being placed in solitary confinement, Mr. Hammond experienced anxiety, depression, insomnia, mood swings, auditory and visual hallucinations, and thoughts of self-harm.

237.    Mr. Hammond has been in solitary confinement for over a decade.

238.    Mr. Hammond is currently incarcerated in the IMU at SCI Phoenix but has previously been held in other solitary confinement housing units, including the Security Threat Group Management Unit (STGMU) at SCI Fayette[33] and the IMUs at SCI Greene and SCI Camp Hill.

239.    Mr. Hammond has been in the IMU since November 2020, but the IMU program did not officially begin until the end of 2021.

240.    Mr. Hammond is currently on Phase 5 of the IMU.

241.    Mr. Hammond has been on the RRL since 2013.

242.    He was told his initial placement on the RRL was due to his failure out of the STGMU program, despite never being involved in security threat group activity.

---

[33] *See* Second Amended Complaint, *Bell v. Little*, 2:22-cv-01516 (W.D. Pa.), ECF No. 75 (raising constitutional and statutory challenges against the STGMU).

243.    Because of his status on the RRL, he is only permitted to use the showers three times per week—thus he has no access to hot washing 208 days per year.

244.    He is confined to his cell for 22 or more hours every day.

245.    The extreme isolation and brutal conditions of solitary confinement have caused Mr. Hammond to attempt suicide eight times and inflict self-harm on over 100 separate occasions.

246.    Since he has been in solitary confinement, Mr. Hammond's mental illness symptoms have all worsened and he has additionally begun to experience trouble focusing, intrusive thoughts, and memory problems.

247.    Mr. Hammond is currently engaged to his girlfriend of over ten years, but they cannot get married because the DOC prohibits marriage for people on the RRL.

248.    Mr. Hammond does not receive communication often from any of his family members as his placement in solitary confinement and limited visiting allowances have made it hard for him to sustain those relationships.

249.    Mr. Hammond is not permitted to participate in programming that would allow him to become parole eligible.

250.    Despite Mr. Hammond's extensive history of mental illness and dangerous decompensation while in solitary confinement, Defendants Malishchak, Little, Wenerowicz, and Harry have kept him in solitary confinement and failed to take reasonable measures to protect his health, safety, and psychological well-being.

251.    If Mr. Hammond were removed from solitary confinement, he would try to get married, work towards becoming eligible for parole, pursue educational opportunities that are offered to those in general population, and hug his mother.

*David Thompson*

252.    David Thompson is twenty-five years old, and he has been incarcerated in the DOC since July 2018.

253.    Mr. Thompson has a long history of both institutionalization and mental health issues.

254.    He was diagnosed with anxiety and depression at age 12 when he was a resident at the Glen Mills Schools.

255.    He was also institutionalized twice at the North Central Secure Treatment Unit, a youth detention center in Danville, Pennsylvania, in 2015 and 2016.

256.    He has a "C" designation on the MH/ID Roster, and he is receiving medication for his mental illness.

257.    He is currently incarcerated at SCI Pine Grove after being transferred there in August 2023.

258.    He has received more than 15 misconducts in DOC custody resulting in placements in solitary confinement

259.    He has also been held in solitary confinement on AC status on at least two occasions.

260.    Cumulatively, he has been housed in solitary confinement for approximately five of the six years he has been in DOC custody.

261.    Before his transfer to SCI Pine Grove, Mr. Thompson spent time in solitary confinement at SCI Forest, SCI Phoenix, SCI Rockview, and SCI Chester.

262.    In December 2020, while he was housed at SCI Rockview, Mr. Thompson hanged himself in his cell, using a bedsheet, in an attempt to take his own life.

263.    He had been trying to get help from psychology staff for days before, but to no avail.

264.    Corrections officers sprayed him with pepper spray and then issued him a misconduct.

265.    Mr. Thompson was placed on DC status at SCI Forest in approximately January 2022 and remained in solitary on DC and then AC status until his transfer to SCI Pine Grove in August 2023, a period of approximately 19 months.

266.    While in solitary confinement at SCI Forest, Mr. Thompson was locked in his cell for nearly 24 hours every day.

267.    He was supposed to receive an hour of recreation every day, but that rarely occurred.

268.    He was also supposed to receive three ten-minute showers each week. However, he was often denied showers, frequently only getting one shower a week and left with no option but to clean himself using the sink in his cell (also known as a "birdbath").

269.    While on DC status, he was not permitted to use the phone.

270.    Thus, he was unable to call his family members, including his children, for well over a year.

271.    When he arrived at SCI Pine Grove, Mr. Thompson spent a week in the RHU before being transferred to general population for a couple of months.

272.    He was told that he was placed in solitary confinement during his first week at SCI Pine Grove because he was problematic at his last prison.

273.    In November 2023, he was unexpectedly transferred to the RHU in solitary confinement for a period of three weeks, and eventually released back to general population with no explanation other than that he was "under investigation."

274.    As a result of his repeated placement in solitary confinement, Mr. Thompson experiences constant, uncontrolled high-intensity anxiety and depression.

275.    His housing in solitary has caused him to have suicidal thoughts, and he has attempted suicide three times while in solitary confinement.

276.    Solitary confinement has made him constantly angry and depressed and has resulted in ceaseless intrusive thoughts.

277.    When Mr. Thompson is not in solitary confinement, like now, he, justifiably, fears that he could be placed back in the RHU at any time.

278.    Mr. Thompson is at substantial risk of being placed back in solitary confinement due to several factors.

279.    First, Mr. Thompson received additional misconducts in February 2024. For one he was placed on cell restriction; for another he has an upcoming disciplinary hearing that is likely to result in his return to solitary confinement.

280.    Second, Mr. Thompson remains subject to the same disciplinary policy as before, a policy that allows him to be placed in solitary confinement, without limitations, despite his known mental health conditions.

281.    Third, Mr. Thompson's serious mental health conditions make it more challenging for him to comply with rules and avoid conflict in the prison context. This is borne out by his repeated placement in solitary confinement throughout his time in the DOC and the fact that those

with mental health conditions, such as Mr. Thompson, make up a disproportionate share of the solitary confinement population in the DOC.

282.    Fourth, the DOC allows corrections officers considerable discretion in issuing misconduct charges or placing somebody in solitary confinement for administrative reasons. This renders Mr. Thompson vulnerable to placement in solitary confinement, which has been where he has been housed for the vast majority of his time in DOC custody.

283.    Fifth, Mr. Thompson has already spent approximately 5 years in solitary confinement, and solitary confinement is known to cause lasting psychological harm that can adversely impact an individual's ability to comply with institutional rules.

284.    Mr. Thompson is thus at heightened and substantial risk of being moved back to the RHU at any time, which will subject him to conditions that exacerbate his mental health symptoms and place him at substantial risk of decompensation, self-harm, and death by suicide.

285.    Despite Mr. Thompson's extensive history of mental illness and dangerous decompensation while in solitary confinement, Defendants Malishchak, Little, and Harry have allowed him to be repeatedly placed in solitary confinement and failed to take reasonable measures to protect his health, safety, and psychological well-being.

*Antoine Walker*

286.    Antoine Walker is thirty-two years old, and he has been incarcerated in the DOC for the past 13 years.

287.    He has a diagnosis of anxiety.

288.    He has a "C" designation on the MH/ID Roster and he receives medication for his mental illness.

289.    He is currently housed in solitary confinement at the IMU at SCI Greene.

290.    He is on the RRL and has been since approximately February 2018.

291.    He has been housed in solitary confinement for approximately six consecutive years.

292.    Prior to being transferred to SCI Greene, he was housed in solitary confinement at SCI Coal Township, SCI Frackville, SCI Smithfield, and SCI Mahanoy.

293.    Mr. Walker spends about 22 hours each day confined in his cell.

294.    Since his placement in solitary confinement, Mr. Walker has experienced sensory overload, depression, intrusive thoughts, sleep difficulty, concentration difficulties, anger, suicidality, and auditory hallucinations.

295.    All of his symptoms have worsened since his placement on the RRL.

296.    Mr. Walker has attempted suicide six times while in solitary confinement.

297.    He has engaged in self-harm four times while in solitary confinement.

298.    Despite Mr. Walker's extensive history of mental illness and dangerous decompensation while in solitary confinement, Defendants Malishchak, Little, Wenerowicz, and Harry have kept him in solitary confinement and failed to take reasonable measures to protect his health, safety, and psychological well-being.

*Muwsa Green*

299.    Muwsa Green is thirty-five years old, and he has been incarcerated in the DOC since 2008.

300.    Prior to his incarceration, he was diagnosed with schizophrenia.

301.    While incarcerated in the DOC, he has been diagnosed with schizophrenia, borderline intellectual function disorder, and impulse control disorder.

302.    Mr. Green has a "C" designation on the MH/ID Roster, and he is currently receiving the medication Zyprexa for his mental illness.

303.    Mr. Green has spent more than 10 years in solitary confinement at SCIs Fayette, Somerset, Greene, Benner, Camp Hill, Mahanoy, Albion, Rockview, Huntingdon, Phoenix, and Houtzdale.

304.    Mr. Green was held in solitary confinement without interruption from 2009 to 2015 at SCI Fayette.

305.    After being transferred to SCI Somerset in 2015, and while still in solitary, Mr. Green had a mental health breakdown and was involuntarily committed to the Mental Health Unit (MHU) at SCI Pittsburgh.

306.    Mr. Green's MH/ID Roster designation was changed to "D," and he was sent to the Secure Residential Treatment Unit (SRTU) at SCI Greene, where he was housed from 2016 through 2018.

307.    The SRTU allowed at least four hours out-of-cell time per day including 10 hours of structured activities per week, along with increased mental health treatment and monitoring.

308.    In 2019, while still on the D Roster, Mr. Green attempted suicide while on disciplinary custody status at SCI Phoenix.

309.    Following that, he was placed in a psychiatric observation cell where he attempted to harm himself.

310.    He then was involuntarily committed to the MHU at SCI Camp Hill.

311.    Upon his return to SCI Phoenix, he again attempted suicide, and as a result was transferred to the MHU at SCI Rockview.

312.     In 2020, the DOC changed Mr. Green's D-Roster designation to "C" after the removal of his schizophrenia diagnosis, despite his having been diagnosed with schizophrenia since childhood.

313.     Although Mr. Green was stripped of his schizophrenia diagnosis, he continues taking Zyprexa, a medication prescribed to people with schizophrenia, which has been provided by the DOC.

314.     In July 2023, Mr. Green was placed in a psychiatric observation cell at SCI Rockview after he expressed that he was feeling suicidal upon being placed in solitary confinement.

315.     He was returned to solitary confinement after spending a week in the psychiatric observation cell.

316.     After a brief stint in general population, Mr. Green was sent to solitary confinement at SCI Houtzdale for 120 days in October 2023 for a non-violent rule infraction.

317.     Prior to the conclusion of his 120-day sentence to solitary confinement, Mr. Green was issued another misconduct for a non-violent rule infraction. He remains in solitary confinement in the RHU.

318.     Mr. Green rarely leaves his cell for the recreation cage due to the self-isolating effects of solitary confinement.

319.     On DC status, Mr. Green is not permitted to make phone calls, have contact visits, send emails on the tablet, or have possession of his tablet, radio, or television.

320.     On December 28, 2023, at his Program Review Committee (PRC) hearing, Mr. Green requested a mental health evaluation and release from solitary. Both requests were denied.

321.    As a result of his placement in solitary confinement, Mr. Green has experienced memory problems, auditory hallucinations including hearing voices, heightened anxiety, inability to concentrate, feelings of being stigmatized, emotional lability, and depression.

322.    His solitary confinement has also caused him to have suicidal thoughts, resulting in approximately eight suicide attempts and more than 20 incidents of self-harm.

323.    Despite Mr. Green's extensive history of mental illness and dangerous decompensation while in solitary confinement, Defendants Malishchak, Little, and Harry have allowed him to be repeatedly placed him in solitary confinement and failed to take reasonable measures to protect his health, safety, and psychological well-being.

*Tyrone Leonard*

324.    Tyrone Leonard is thirty-three years old, and he has been incarcerated in the DOC since 2016.

325.    While incarcerated in the DOC, he has been diagnosed with bipolar disorder and antisocial personality disorder.

326.    Mr. Leonard has a "C" designation on the MH/ID Roster, and he is receiving medication for his mental illness, including the anti-depressant Remeron.

327.    Before his transfer to SCI Rockview, where he is housed now, Mr. Leonard was held in solitary confinement in the RHU frequently.

328.    Cumulatively, Mr. Leonard has spent approximately five years in solitary confinement at SCIs Forest, Greene, and Rockview.

329.    Mr. Leonard was sent to solitary confinement at SCI Rockview for 90 days in September 2023 for a non-violent rule infraction.

330.    Three days later, he received an additional 30 days of DC time for a non-violent rule infraction.

331.    As a result of the strip searches required before recreation, his deteriorating mental health, and corrections officers not consistently offering recreation time, Mr. Leonard has only taken his one hour of daily recreation a handful of times since September 2023.

332.    On DC status, Mr. Leonard is not permitted to make phone calls, which prevents him from checking on his family and fiancé and increases his anxiety.

333.    As a result of his repeated placement in solitary confinement, Mr. Leonard experiences increased anxiety, mood swings, difficulty with anger, and suicidal thoughts.

334.    Mr. Leonard has attempted suicide on three occasions while in solitary confinement, including twice in 2023.  He has never attempted suicide in general population.

335.    When he is placed in solitary confinement, he experiences feelings of hopelessness and feels like he doesn't matter and isn't even human.

336.    After each period in the RHU, it becomes increasingly difficult for Mr. Leonard to readjust to general population.  He is more prone to angry outbursts and has difficulty staying calm.

337.    Mr. Leonard is at substantial risk of being placed in solitary confinement due to several factors.

338.    First, Mr. Leonard remains subject to the same disciplinary policy as before, a policy that allows him to be placed in solitary confinement, without limitations, despite his known mental health conditions.

339.    Second, Mr. Leonard's serious mental health conditions make it more challenging for him to comply with rules and avoid conflict in the prison context. This is borne out by his

repeated placement in solitary confinement throughout his time in the DOC and the fact that those with mental health conditions, such as Mr. Leonard, make up a disproportionate share of the solitary confinement population in the DOC.

340.    Third, the DOC allows corrections officers considerable discretion in issuing misconduct charges or placing somebody in solitary confinement for administrative reasons. This renders Mr. Leonard vulnerable to placement in solitary confinement, which has been where he has been housed for the vast majority of his time in DOC custody.

341.    Fourth, Mr. Leonard has already spent approximately 5 years in solitary confinement, and solitary confinement is known to cause lasting psychological harm that can adversely impact an individual's ability to comply with institutional rules.

342.    Mr. Leonard is thus at heightened and substantial risk of being moved back to the RHU at any time, which will subject him to conditions that exacerbate his mental health symptoms and place him at substantial risk of decompensation, self-harm, and death by suicide.

343.    Despite Mr. Leonard's extensive history of mental illness and dangerous decompensation while in solitary confinement, Defendants Malishchak, Little, and Harry have allowed him to be repeatedly placed in solitary confinement and failed to take reasonable measures to protect his health, safety, and psychological well-being.

*Malika Henderson*

344.    Malika Henderson is twenty-nine years old, and she has been incarcerated in the DOC since 2015.

345.    While incarcerated in the DOC, she has been diagnosed with mood disorder, anxiety, intermittent explosive disorder, ADHD, antisocial personality disorder, and PTSD.

346.    Ms. Henderson currently has a "C" designation on the MH/ID Roster, and she is receiving Zyprexa for her mental illness., which is an anti-psychotic medication.

347.    Ms. Henderson has had mental health diagnoses that she has received treatment for since she was four years old. These diagnoses include schizoaffective disorder, reactive attachment disorder, and bipolar II disorder.

348.    Ms. Henderson spent her childhood cycling through numerous foster homes, group homes, and residential treatment facilities until she was 18.

349.    Ms. Henderson is currently incarcerated at SCI Muncy, where she has been held in solitary confinement in the RHU frequently.

350.    Ms. Henderson has received more than 100 misconducts while in DOC custody.

351.    Ms. Henderson has spent approximately six years cumulatively in solitary confinement at SCI Muncy.

352.    Presently, Ms. Henderson has been in solitary confinement consecutively for more than 21 months.

353.    She has been on the RRL since October 2022.

354.    Since she has been on the RRL, Ms. Henderson typically has been offered two hours in the outdoor cage per day and one hour of group per day, on weekdays, during which she is placed in a small cage.

355.    On Saturday and Sunday, Ms. Henderson is not permitted to leave her cell at all.

356.    At times when she is permitted to go to group, Ms. Henderson goes to a room with at most 4 other women held in solitary confinement where each of them is placed inside a tiny, individual cage the size of a phone booth.

357.    When this occurs, the women are given coloring exercises, do arts and crafts, watch cartoons or movies, or have books read to them.

358.    Ms. Henderson finds this version of caged, group activity to be childish, restrictive, and ineffective at helping her mental health symptoms.

359.    Ms. Henderson currently spends 20–21 hours per day in her cell and all 48 hours on the weekend. All of her out-of-cell time consists of placement in another cage with severely limited opportunities to interact with other people.

360.    Ms. Henderson has spent much of her time in solitary confinement on DC status.

361.    Mr. Henderson is not permitted to make phone calls on DC status, which has further isolated her and harmed her relationships with people outside the prison.

362.    As a result of her placement in solitary confinement, Ms. Henderson's anxiety and suicidality have been severely worsened.

363.    Ms. Henderson has attempted suicide on more than ten occasions while in solitary confinement.

364.    In February 2024, Ms. Henderson's grandmother died.

365.    Because she was in solitary confinement on RRL, she was not permitted to virtually attend the funeral by video link.

366.    Ms. Henderson attempted suicide as a result.

367.    Despite Ms. Henderson's extensive history of mental illness and dangerous decompensation while in solitary confinement, Defendants Malishchak, Little, Wenerowicz, and Harry have kept her in solitary confinement and failed to take reasonable measures to protect her health, safety, and psychological well-being.

## CLASS ACTION ALLEGATIONS

368.    This suit is properly maintainable as a class action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

369.    All Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following class of similarly situated persons (the "Mental Health Class"):

> All individuals who are currently or in the future will be housed in an SL5 unit in the Pennsylvania Department of Corrections (DOC) and who have ever had a "C" or "D" designation on the DOC's MH/ID Roster.

370.    Additionally, all Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following class of similarly situated persons (the "Prolonged Solitary Confinement class"):

> All individuals who are currently or in the future will be housed in any SL5 unit in the Pennsylvania Department of Corrections and who have spent three years or longer, whether cumulative or continuous, in an SL5 unit.

371.    Additionally, all Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following class of similarly situated persons (the "Disability Class"):

> All individuals who are currently or in the future will be housed in any SL5 unit in the Pennsylvania Department of Corrections and have a mental health condition that substantially limits one or more major life activities.

372.    Plaintiffs Hammond, Walker and Henderson also bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following class of similarly situated persons (the "RRL Class"):

> All individuals who are or in the future will be on the Pennsylvania Department of Corrections' Restricted Release List (RRL).

373.    Plaintiffs Hammond and Walker also bring this action under Fed. R. Civ. P. 23(b)(2) on behalf of themselves and the following class of similarly situated persons (the "IMU Class"):

> All individuals who are or in the future will be held in an Intensive Management Unit (IMU) in the DOC.

374.    All Plaintiffs also bring this action under Fed. R. Civ. P. 23(b)(3) on behalf of themselves and the following class of similarly situated persons (the "Mental Health Damages Class"):

> All individuals housed in an SL5 unit in the Pennsylvania Department of Corrections (DOC) at any time since March 4, 2022 who have ever had a "C" or "D" designation on the DOC's MH/ID Roster.

375.    Additionally, all Plaintiffs bring this action under Fed. R. Civ. P. 23(b)(3) on behalf of themselves and the following class of similarly situated persons (the "Prolonged Solitary Confinement Damages Class"):

> All individuals who have spent three years or longer, whether cumulative or continuous, in any SL5 unit in the DOC and have been housed in an SL5 unit at any time since March 4, 2022.

376.    The members of the Mental Health Class and Mental Health Damages Class number in excess of 800 at present, and that number will increase as individuals are transferred into solitary confinement in the future such that joinder of all of the individual class members is impracticable.

377.    The members of the Prolonged Solitary Confinement Class and Prolonged Solitary Confinement Damages Class, upon information and belief, number in excess of 100 at present, and that number will increase as individuals are transferred into the solitary confinement housing units in the future such that joinder of all of the individual class members is impracticable.

378.    The members of the Disability Class number in excess of 800 at present, and that number will increase as individuals are transferred into the solitary confinement housing units in the future such that joinder of all of the individual class members is impracticable.

379.    The members of the RRL Class number in excess of 125 at present, and that number will increase as individuals are placed on the RRL in the future such that joinder of all of the individual class members is impracticable.

380.    The members of the IMU Class number in excess of 100 at present, and that number will increase as individuals are placed in the IMU in the future such that joinder of all of the individual class members is impracticable.

381.    The exact size of the Classes and the identities of the individual members of the Classes (other than future members) can be determined largely through Defendants' records.

382.    The named Plaintiffs' claims are typical of the claims of all other members of the Classes.

383.    The claims of the named Plaintiffs and the other members of the Classes are based on the same legal theories and arise from the same unlawful conduct.

384.    The Class Members all have suffered similar injuries as a result of Defendants' conduct.

385.    The named Plaintiffs and their counsel will adequately represent the interests of the Classes.

386.    Plaintiffs seek relief that will benefit the entirety of the classes.

387.    Plaintiffs' counsel are experienced in civil rights, prisoner rights, and class action litigation.

388.    There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect only individual Class Members.

389.    Common questions of law and fact affecting members of the Class include, but are not limited to:

a.    Whether Defendants' policies and practices of permitting the placement of Mental Health Class Members in solitary confinement violate the Eighth Amendment;

b.    Whether Defendants' failure to train mental health staff in recognizing and diagnosing the symptoms of trauma caused or exacerbated by solitary confinement, and Defendants' failure to train mental health staff in prescribing clinical interventions in regard to these symptoms, constitute deliberate indifference and/or a failure to provide a reasonable accommodation to the mental health care needs of Mental Health and Disability Class Members;

c.    Whether Defendants' policies and practices of permitting the placement of Disability Class Members in solitary confinement housing units violate the Americans with Disabilities Act and the Rehabilitation Act;

d.    Whether the DOC denies Disability Class Members the benefits of its programs, services, or activities or otherwise discriminates against by reason of their disabilities;

e.    Whether Defendants' policies and practices of permitting long-term isolation of the Prolonged Solitary Confinement Class violate the Eighth Amendment;

f.      Whether Defendants' policies and practices regarding placement on the

RRL and subsequent housing in solitary confinement violate the Fourteenth

Amendment procedural due process rights of members of the RRL Class;

g.      Whether Defendants' policies and practices regarding placement in the

IMU for a minimum of three years without the opportunity to challenge their

placement in the unit or end their solitary confinement once in the unit violate the

Fourteenth Amendment procedural due process rights of members of the IMU

Class.

390.    Defendants have acted or refused to act on grounds that apply generally to each

Class, and which make declaratory or injunctive relief appropriate for each Class as a whole.

391.    Absent a class action, most Class Members would find the cost of litigating their

claims to be prohibitive, or would be unable to locate counsel, and thus would have no effective

remedy.

392.    Common questions of law and fact predominate over questions affecting only

individual members of the proposed Classes.

393.    The class treatment of common questions of law and fact is also superior to multiple

individual actions or piecemeal litigation in that it conserves the resources of the courts and the

litigants and promotes consistency and efficiency of adjudication.

## CAUSES OF ACTION

**COUNT I: Eighth Amendment – Solitary Confinement of Individuals with Mental Illness**
**All Individual Plaintiffs, Mental Health Class, and Mental Health Damages Class v.**
**Defendants Harry, Little, Wenerowicz, and Malishchak**

394.    Plaintiffs incorporate by reference the allegations set forth in all of the preceding

paragraphs as though set forth fully herein.

395.    The Mental Health Class Members have mental health conditions that the Defendants recognize require treatment. These mental health conditions place them at heightened risk of decompensation, emotional pain and suffering, elevated anxiety, panic attacks, hypertension, severe depression, and suicidality if they are placed or retained in solitary confinement.

396.    Mental Health Class Members are experiencing some or all of the following symptoms that are known to be caused by solitary confinement: anxiety, depression, intrusive thoughts, sleeping difficulties, memory problems, inability to concentrate, anger and difficulty controlling anger, emotional lability, lonesomeness, suicidality, and auditory and visual hallucinations.

397.    Defendants are aware that Mental Health Class Members' mental health conditions place them at risk of substantial harm when placed in solitary confinement and nonetheless deprive them of basic human needs such as mental and physical health, social interaction, exercise, and environmental stimulation.

398.    Defendants have acted and continue to act with deliberate indifference to the Mental Health Class Members' mental health conditions in that they place or retain Class Members in solitary confinement despite the well-known risk of substantial harm to their lives and health caused by such isolation.

399.    The placement of Mental Health Class members in solitary confinement, despite the consensus that such confinement harms their health, deprives them of basic human needs, and presents a substantial risk to their life and safety, violates the Eighth Amendment.

**COUNT II: Eighth Amendment – Prolonged Solitary Confinement**
**All Individual Plaintiffs, Prolonged Solitary Confinement Class, and Prolonged Solitary**
**Confinement Damages Class v. Defendants Harry, Little, Wenerowicz, and Malishchak**

400.    Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

401.    The Prolonged Solitary Confinement Class Members have each been in solitary confinement cumulatively for at least three years during their incarceration in the DOC. These conditions place them at a substantial risk of serious harm, including psychological decompensation, emotional pain and suffering, elevated anxiety, panic attacks, hypertension, severe depression, and suicidality if they are not provided relief from continued solitary confinement.

402.    Prolonged Solitary Confinement Class Members are experiencing some or all of the following symptoms that are known to be caused by solitary confinement: anxiety, depression, intrusive thoughts, sleeping difficulties, memory problems, inability to concentrate, anger and difficulty controlling anger, emotional lability, lonesomeness, suicidality, and auditory and visual hallucinations.

403.    Defendants are aware that Prolonged Solitary Confinement Class Members are at risk of substantial harm due to their long-term isolation, which deprives them of basic human needs such as mental and physical health, social interaction, exercise, and environmental stimulation.

404.    Defendants have acted and continue to act with deliberate indifference to the health and safety of Prolonged Solitary Confinement Class Members in that they place or retain Class Members in solitary confinement despite the well-known risk of substantial harm to their lives and health caused by such isolation.

405.    The placement of Prolonged Solitary Confinement Class Members in solitary confinement, despite the consensus that such confinement harms their health, deprives them of basic human needs, and presents a substantial risk to their life and safety, violates the Eighth Amendment.

**COUNT III: Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132**
**All Individual Plaintiffs, Disability Class, and Mental Health Damages Class v. Defendant Pennsylvania Department of Corrections and Defendant Harry in her official capacity**

406.    Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

407.    Plaintiffs, Disability Class Members, and Mental Health Damages Class Members are qualified individuals with disabilities that substantially limit many of their major life activities including but not limited to learning, reading, concentrating, thinking, communicating, and interacting with others.

408.    Defendant Pennsylvania Department of Corrections is a public entity pursuant to 42 U.S.C. §12131.

409.    The DOC has discriminated against the Disability Class Members and Mental Health Damages Class Members on the basis of their psychiatric disabilities by, among other things:

    a.    placing and/or retaining Class Members in solitary confinement on the basis of their psychiatric disabilities and manifestations thereof, including issuing misconducts and phase setbacks for behavior caused by their psychiatric disabilities, thus excluding them from programs, services, and activities on the basis of their disabilities;

b.  failing to make reasonable modifications to its policies and procedures to account for and reduce the known deleterious effects of solitary confinement on individuals with psychiatric disabilities; and

c.  failing to make reasonable modifications to its policies and procedures to enable Class Members to derive the same benefits from the DOC's programs, services, and activities as similarly situated individuals without psychiatric disabilities.

410.    In particular, the DOC has failed to adequately identify and provide accommodations to Class Members in that it:

a.  does not have a reliable system for diagnosing or screening for mental health conditions and decompensation in SL5 units, but instead relies on non-confidential cell-side rounds that are known to be ineffective at eliciting meaningful mental health information;

b.  does not conduct an assessment upon placement into SL5 units to identify whether Class Members are currently or have in the past experienced mental health conditions or symptoms that place them at a heightened risk of decompensation in solitary confinement;

c.  does not conduct confidential evaluations after self-harm incidents;

d.  does not evaluate Class Members and reconsider their mental health classification after self-harm incidents or other instances of serious psychiatric decompensation;

e.  does not provide sufficient training to staff on interacting with individuals with psychiatric disabilities;

f.  permits the use of punitive measures in response to requests for mental health treatment;

g.  permits the use of punitive measures in response to behaviors that are expected from and consistent with the mental health conditions of the Class Members;

h.  permits the use of punitive measures that are greater than necessary to maintain discipline or protect others from harm; and

i.  places and retains Class Members in solitary confinement notwithstanding their mental health conditions and the extraordinarily well-established risk that solitary confinement presents to Class Members.

411.    Class Members' placement and/or retention in SL5 units excludes them from and/or denies them the benefits of numerous programs, services and activities in the DOC, including but not limited to: congregate meals and recreational activity; contact visitation; telephone access; email kiosk access; and educational, vocational, and rehabilitative programming, including all programming necessary for parole.

412.    The DOC's discrimination against Named Plaintiffs and Class Members is intentional. The DOC is deliberately indifferent in that it has persisted in its discriminatory conduct despite being aware that its policies and procedures related to SL5 units make it substantially likely that disabled individuals will be denied their federally protected rights under the ADA.

413.    The DOC is also vicariously liable for the deliberate indifference of the individual Defendants and other DOC employees.

414.    The DOC's violations of Plaintiffs' and Class Members' rights under the ADA have caused them, *inter alia*, physical pain and suffering, lost opportunities for programming and out-of-cell activity, loss of liberty, exacerbation of their mental illnesses, and emotional harm and mental anguish.

**COUNT IV: Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**All Individual Plaintiffs, Disability Class, and Mental Health Damages Class v.**
**Defendant Pennsylvania Department of Corrections**

415.     Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

416.     Plaintiffs, Disability Class Members and Mental Health Damages Class Members are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

417.     Defendant DOC receives federal funding within the meaning of the Rehabilitation Act.

418.     The DOC violates Section 504 of the Rehabilitation Act by discriminating against people with psychiatric disabilities. *See supra* ¶ 409.

419.     The DOC violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate Plaintiffs and Disability Class Members with psychiatric disabilities in its programs, activities, and services. *See supra* ¶ 410.

420.     The DOC's discrimination against Class Members is intentional. The DOC is deliberately indifferent in that it has persisted in its discriminatory conduct despite being aware its policies and procedures related to the SL5 units make it substantially likely that disabled individuals will be denied their federally protected rights under the Rehabilitation Act.

421.     The DOC's violations of Plaintiffs' and Class Members' rights under the Rehabilitation Act have caused them, *inter alia*, physical pain and suffering, lost opportunities for programming and out-of-cell activity, loss of liberty, and exacerbation of their mental illnesses.

**COUNT V: Fourteenth Amendment – Procedural Due Process**
**Plaintiffs Hammond, Walker, Henderson, and the RRL Class v. Defendants Harry and**
**Wenerowicz**

422.     Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

423.     Placement in solitary confinement on the RRL is an atypical and significant hardship in relation to the ordinary incidents of prison life in the DOC in at least six ways: 1) the extreme isolation those on the RRL are subjected to; 2) the differences in access to recreation time, programming, and other privileges between those on the RRL and those in general population; 3) the duration and indefinite nature of solitary confinement for those on the RRL; 4) the inability to be granted parole while housed in solitary confinement on the RRL; 5) the stigmatizing impact that RRL confinement has throughout one's incarceration, subjecting the individual to heightened risk of return to solitary confinement in the future; 6) the lack of periodic opportunity to be heard by the decision-maker regarding retention in solitary confinement on RRL status.

424.     RRL Class Members typically have endured prolonged solitary confinement of one or more years prior to their placement on the RRL, adding weight to their liberty interest in avoiding placement on the RRL in the first instance.

425.     Defendants are violating RRL Class Members' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to provide them with notice of the reasons for their initial or continued placement on the RRL, any meaningful review of their initial or continued placement on the RRL or in solitary confinement, or any meaningful opportunity to challenge their initial or continued placement on the RRL or in solitary confinement.

426.    Defendants' acts and omissions are causing substantial physical and psychological harm to RRL Class Members and exposing them to a substantial risk of future harm, including permanent psychological damage and death by suicide.

### COUNT VI: Fourteenth Amendment – Procedural Due Process
### Plaintiffs Hammond, Walker and IMU Class v. Defendants Harry and Wenerowicz

427.    Plaintiffs incorporate by reference the allegations set forth in all of the preceding paragraphs as though set forth fully herein.

428.    Placement in solitary confinement in the IMU is an atypical and significant hardship in relation to the ordinary incidents of prison life in the DOC in at least six ways: 1) the extreme isolation those in the IMU are subjected to; 2) the duration, a minimum of 3 years, and indefinite nature of solitary confinement for those in the IMU; 3) the inability to be granted parole while housed in solitary confinement in the IMU; 4) the stigmatizing impact that IMU confinement has throughout one's incarceration, subjecting the individual to heightened risk of return to solitary confinement in the future; 5) the lack of periodic opportunity to be heard by the decision-maker regarding retention in solitary confinement in the IMU; 6) the denial of privileges and programming while in the IMU.

429.    IMU Class Members typically have endured prolonged solitary confinement of one or more years prior to their placement in the IMU, adding weight to their liberty interest in avoiding placement in the IMU in the first instance.

430.    Defendants are violating IMU Class Members' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution by failing to provide them with any meaningful individualized review of their placement in solitary confinement or any meaningful opportunity to challenge their continued placement in solitary confinement.

431.    Defendants' acts and omissions are causing substantial physical and psychological harm to IMU Class Members and exposing them to a substantial risk of future harm, including permanent psychological damage and death by suicide.

### REQUESTED RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.    Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23;

B.    Adjudge and declare that the acts and omissions of Defendants as described herein are in violation of Plaintiffs' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act;

C.    Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from continuing these unlawful acts, conditions and practices, as described in this Complaint;

D.    Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from placing Mental Health Class Members in solitary confinement;

E.    Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from retaining Prolonged Solitary Confinement Class Members in solitary confinement;

F.    Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from placing or retaining RRL Class Members in solitary confinement without the procedural protections required by the Due Process Clause;

G.    Enjoin Defendants and all persons acting in concert with them, or acting as their agents, from placing or retaining IMU Class Members in solitary confinement without the procedural protections required by the Due Process Clause;

H.  Enjoin Defendant DOC from discriminating against Disability Class Members on the basis of their disability in violation of the Americans with Disabilities Act and Rehabilitation Act;

I.  Grant the individually named plaintiffs compensatory, punitive, and nominal damages for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution and compensatory and nominal damages for violations of the Americans with Disabilities Act and the Rehabilitation Act;

J.  Grant compensatory, punitive, and nominal damages to Mental Health Damages Class and Prolonged Solitary Confinement Damages Class Members for violations of the Eighth Amendment to the U.S. Constitution;

K.  Grant compensatory and nominal damages to members of the Mental Health Damages Class for violations of the Americans with Disabilities Act and Rehabilitation Act;

L.  Grant attorneys' fees and costs;

M.  Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction;

N.  Award such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs request a trial by jury with respect to all matters and issues properly triable by a jury.

Respectfully submitted,


*/s/ Bret Grote*
Bret Grote (PA 317273)
*/s/ Jaclyn Kurin*
Jaclyn Kurin (D.C. ID No. 1600719)
(*pending pro hac vice*)
*/s/ Dolly Prabhu*
Dolly Prabhu (PA 328999)
ABOLITIONIST LAW CENTER
PO Box 16537
Philadelphia, PA 19122
(412) 654-9070
bretgrote@abolitionistlawcenter.org
jkurin@alcenter.org
dolly@alcenter.org


*/s/ Matthew A. Feldman*
Matthew A. Feldman (PA 326273)
PENNSYLVANIA INSTITUTIONAL
LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan Kurtz (PA 321631)
PENNSYLVANIA INSTITUTIONAL
LAW PROJECT
247 Fort Pitt Blvd, 4th Fl.
Pittsburgh, Pa 15222
412.434.6004
amorgan-kurtz@pilp.org


*/s/ Will W. Sachse*
Will W. Sachse (PA 84097)
Noah Becker (PA 327752)
Stormie Mauck (PA 328048)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2496
will.sachse@dechert.com
noah.becker@dechert.com
stormie.mauck@dechert.com


*Counsel for Plaintiffs*


DATED: March 4, 2024